884 A.2d 199

**Corey Ricardo CALDWELL**

v.

**STATE of Maryland.**

**No. 2439, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Oct. 4, 2005.

**614**

**616**

618

Amy E. Brennan (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Sarah Page Pritzlaff (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Baltimore City, Corey Caldwell, the appellant, was charged in two indictments with crimes arising from the shooting of Darian Nelson and the attempted shooting of Davon Jackson, in a single incident. The charges were tried together to a jury.

In the Nelson case, the jury returned verdicts of not guilty of attempted first-degree murder and guilty of first-degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, carrying a handgun, and discharging a handgun in Baltimore City. It did not return a verdict on the charge of attempted second-degree murder.

In the Jackson case, the jury returned a verdict of guilty of first-degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, carrying a handgun, and discharging a handgun in Baltimore City. It did not return a verdict on the attempted first-degree murder and attempted second-degree murder charges.

The court *sua sponte* declared a mistrial on the three counts on which no verdicts were returned. The reasons were that the courthouse was closing in less than an hour because Hurricane Isabel was approaching Baltimore and the subways had been shut down; the courthouse likely would be closed the following day, due to the storm; one of the jurors could not return to deliberate the next business day thereafter, without losing a prepaid vacation the court and counsel had assured her, during *voir dire*, she would not lose; and the defense was not willing to proceed with an 11–member jury.

After denying a new trial motion, the court vacated one conviction for carrying a handgun and one conviction for discharging a firearm in Baltimore City, and merged the remaining convictions on those charges. It then imposed sentences in both cases.[1]

The appellant noted a timely appeal. We have rephrased and reordered his questions as follows:

---

1. The appellant was sentenced to concurrent 25–year prison terms for the first-degree assault convictions; concurrent 20–year prison terms, the first five years without the possibility of parole, for the use of a handgun convictions, to be served concurrent to the first-degree assault sentences; and concurrent 5–year prison terms for the reckless endangerment convictions, to be served concurrent to the first-degree assault convictions.

I. Did the trial court err by taking a partial verdict on the ten counts on which guilty verdicts were returned?

II. Did the trial court err by declaring a mistrial on three counts?

III. Must the docket entries be corrected to properly reflect that the appellant was acquitted of attempted first-degree murder of Darian Nelson?

IV. Did the trial court err by permitting the State to impeach the appellant with statements he allegedly made to a person who was not called as a witness?

V. Did the sentencing court err by not merging the appellant's sentences for reckless endangerment into his sentences for first-degree assault?

We answer Question I in the affirmative and therefore shall reverse the ten judgments of conviction and remand the counts on which they are based to the circuit court, for further proceedings. Question II is not properly before us, because there is no final judgment on the three counts on which a mistrial was declared. We answer Question III in the affirmative, and direct the circuit court to correct the docket entries to reflect that the verdict on the count of attempted first-degree murder in the Nelson case was not guilty. Because of our disposition of Question I, and because it is highly speculative whether the issues will resurface on retrial, we shall not address Questions IV and V.

## FACTS AND PROCEEDINGS

The key events in this case took place around 8:00 p.m. on September 3, 2002, on Berger Avenue in Baltimore City. Darian Nelson, then ten years old, was standing in front of his family's house, at 4348 Berger Avenue, with his mother and two brothers. He heard a sound like firecrackers and felt a burning pain in his side. He exclaimed, "firecrackers hit me." At the same time, a man later identified as Davon Jackson ran past him on the street. Jackson continued around the corner, into the Nelson family's backyard. A few minutes later,

Jackson emerged and apologized to Mrs. Nelson, saying, "they were trying to shoot at me."

Emergency medical workers and police arrived on the scene. Nelson was found to have suffered a gunshot wound and was taken to the hospital. The police arrested Jackson and took him to the station house. Jackson told them the shooter was a man he knew as "Ron," who was angry with him because he thought Jackson was having an affair with Muriel Brewington, "Ron's" stepsister. Brewington is the mother of "Ron's" best friend's children.

Jackson showed the police a house near the Nelsons' house where "Ron's" family was living. In a search of the house based on a warrant, the police found information that led them to think the appellant and "Ron" were the same person. The police prepared a photographic array that included the appellant's picture and showed it to Jackson. Jackson selected the appellant's photograph as depicting "Ron," the shooter.

As stated previously, the appellant was charged in two indictments with crimes arising out of the shooting of Nelson and the attempted shooting of Jackson. The cases were tried together before a jury beginning on September 11, 2003.

The State called as witnesses Nelson, his two brothers, and his mother. They testified about the events surrounding the shooting, as we have recounted them. A neighbor, Michelle Coward, testified that she saw the appellant chase Jackson down Berger Avenue and fire a gun at him. She gave the police that information on the day of the shooting, but told them she did not want to be involved. Nine months later, on June 8, 2003, the police showed Coward a photographic array. She selected the appellant's picture from the array. She testified that she was certain that the appellant was the shooter.

The State also called Brewington as a witness. She testified that, in a telephone conversation the morning after the shooting, the appellant told her that he and Jackson had been "tussling" over a gun.

When the State called Jackson to testify, he recanted his statement to the police. He testified that he and the appellant were victims of an attempted robbery by an unknown third person. He said he had blamed the shooting on the appellant because he thought the appellant had "set up" the robbery.

Ballistics evidence showed that two cartridge casings recovered at the scene were fired by the same gun.

The appellant testified in his own defense. He said he had not known Jackson well but had been with him on the evening in question, before the shooting. They were approached by a third man, whom the appellant did not know, who tried to rob them. They ran in opposite directions. As he was running, the appellant heard gunshots. He did not have a gun and did not fire a gun. He never told Brewington that he and Jackson had tussled over a gun. He thought Jackson had "set [him] up" for the robbery.

Another neighbor of the Nelsons, Darrell Brown, testified for the defense. He said that, on the night in question, he saw a man running up Berger Avenue with a gun. The man was not the appellant. Brown did not know the appellant.

We shall include additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I.

#### *Did the trial court err in taking partial verdicts?*

##### (a)

The jury was selected and sworn on September 11, 2003. The evidence phase of the trial lasted three days: September 12, 15, and 16. The case went to the jury for deliberation at about noon on September 17. The jurors deliberated until 5:35 p.m., at which time they sent a note saying they "ha[d] not decide [sic] a verdict yet. Please let us know when it's time to leave." The court released the jurors for the evening.

The jurors returned at 9:30 a.m. the next day, September 18, and resumed deliberation.

In the days before September 18, Hurricane Isabel was moving north, on a path to strike the mid-Atlantic coastline. Forecasts were calling for the hurricane to be severe. In anticipation that it would be, and based on tracking information from the National Weather Service, the Governor of Maryland issued an Executive Order declaring a state of emergency as of 11 p.m. on September 16. *See* Md. Regs. Code tit. 01, § 01.2003.30. The storm was slow-moving, however, and by the morning of September 18, it had not yet made landfall. *See* National Weather Service, "Service Assessment, Hurricane Isabel, September 18–19, 2003," *available at* http://www.weather.gov/os/assessments/pd fs/isabel.

Around noon, as the jury was deliberating, the trial judge was alerted that the Administrative Judge had directed that the courthouse would close at 1:00 p.m., due to the impending hurricane. Counsel and the appellant were convened and the jury was brought into the courtroom. The trial judge announced that the courthouse was closing and was unlikely to be open the next day (Friday September 19), given the weather forecast. He asked the jurors to return Monday, September 22, to resume deliberating.[2]

At that point, Juror Number Two motioned that there was a problem, and was brought to the bench. Both lawyers reminded the judge that during *voir dire* Juror Number Two had made it known that she was leaving on Saturday, September 20, for a prepaid vacation to New Orleans, and had voiced concern about whether sitting on the jury would cause her to lose her vacation. Because the court and counsel all thought the trial would be over by September 19, at the latest, they had assured Juror Number Two that sitting on the jury would not interfere with her travel plans. Juror Number Two could

---

2. Hurricane Isabel struck the central Maryland region later that afternoon and night, flooding portions of Baltimore City. As the trial judge anticipated, the courthouse was closed on Friday, September 19, 2003.

not return to deliberate on Monday, September 22, without losing her prepaid vacation.

Juror Number Two was reseated and the judge and counsel conferred at the bench. Defense counsel said he would not agree to proceed with an 11-person jury. The following ensued:

> THE COURT: I just don't think in good conscious [sic] I think [sic] tell this woman [Juror Number Two]—I remember her discussing this at the bench.
>
> [DEFENSE]: I do too.

At that point, the court called the foreperson to the bench and this colloquy took place:

> THE COURT: And—can the foreperson come up here a second? Ma'am. Are you making progress?
>
> JUROR: Mmm-hum. We are. It's hard.
>
> THE COURT: Okay. Thanks.
>
> JUROR: We're on the last one.
>
> THE COURT: You're what?
>
> JUROR: (inaudible).
>
> THE COURT: Okay. Thanks.

The foreperson returned to her seat, but immediately was called back to the bench:

> THE COURT: Let me make sure I understand you. Were you suggesting that a vote—there was one person who is not agreeing or that you had agreed to a unanimous verdict on every count, but one.
>
> JUROR: Right.
>
> THE COURT: You have a unanimous verdict on every count but one. What count is that?
>
> [PROSECUTOR]: What number as opposed to—do you remember—
>
> THE COURT: Hand me the verdict sheet.
>
> THE CLERK: Yes.
>
> THE COURT: Do you have it?
>
> [DEFENSE]: I have it.

[PROSECUTOR]: Do you have a problem with that?

[DEFENSE]: No.

THE COURT: Which count is it?

JUROR: It's the one on this one.

THE COURT: That is the count [attempted] first-degree murder of Davon Jackson?

JUROR: Jackson.

THE COURT: You haven't agreed to a verdict on that. You've agreed on everything else?

JUROR: Mmm-hum.

THE COURT: Twelve to nothing. Right?

JUROR: We want to change one if they change that one. It's like five people.

[DEFENSE]: Can you say that again? I didn't hear that one.

JUROR: It's like five people that's against.

THE COURT: Pardon.

JUROR: Five people that's against the (inaudible).

THE COURT: All right. Thanks. Do you—all right. You can sit down. . . .

The clerk interjected to say that the subways were closing at 2:00 p.m. and that the rain had started. Defense counsel repeated that he would not agree to an 11–person jury. He objected to the court's taking partial verdicts, saying the jurors "need to make a decision with regard to everything or not." The judge ruled that he was going to take verdicts "on what they have a verdict on."

Counsel returned to their tables and the judge announced:

All right. Let me explain what I'm going to do. I'm confronted with a situation where juror number two who told me when we did voir dire originally that she had to be out of here Saturday. Still has to be out of here Saturday because she has travel plans. Counsel will not agree to accept an 11 person jury so we can't do that.

The foreman has told me which I trust is correct, that you have a 12 to nothing verdict on all but a couple of counts, correct? What I've decided to do and counsel and I will discuss the problems involved with this later, but I'm going to take the verdict on the counts you've reached a unanimous verdict on and end this as far as you're concerned. So, you understand what I'm saying? Can you stand up, madame foreperson? Am I correct in my understanding of what has occurred? All right.

At the bench, defense counsel expressed concern about the court's declaring a mistrial on any count the jurors were not "deadlocked" on. The judge acknowledged that the jury "possibly could" reach verdicts on the undecided counts, if left to deliberate further, but because of the circumstances, he was going to declare a mistrial on those counts.

In open court, the judge addressed the foreperson:

THE COURT: Okay. Stand up again. Am I correct that you have a verdict on all but—how many counts?

JUROR: Two.

THE COURT: Two. You have a unanimous 12 to nothing verdict? I'm going to ask the clerk at this point—stand down—to take the verdict.

Defense counsel objected, saying, "I just want to point out that they're still talking. She [the foreperson] came down here and she's still talking to them."

The judge overruled the objection and summarized the situation: Everyone had been directed by the Administrative Judge to vacate the courthouse; counsel would not agree to an 11–person jury to return on Monday; and one juror could not return on Monday. The judge said he was "declar[ing] a mistrial on the remaining counts for th[ose] reason[s] so the record is clear."

The clerk then took the verdicts, addressing the foreperson and asking her, count by count, to announce each verdict. In the Nelson case, the foreperson stated that the appellant was not guilty of attempted first-degree murder; there was no

verdict on attempted second-degree murder; and the appellant was guilty of first-degree assault, reckless endangerment, unlawful use of a handgun, carrying a handgun, and discharging a handgun in Baltimore City.

In the Jackson case, the foreperson announced that there was no verdict on the attempted first-degree murder count. She then announced a verdict of guilty on the attempted second-degree murder count, but said, "[i]n the first-degree—the first one we don't have no charge on that one. Assault—" The clerk interrupted and asked the foreperson a second time for the jury's verdict on the attempted second-degree murder count in the Jackson case. The foreperson responded but her answer was recorded as "inaudible." She proceeded to announce verdicts of guilty on the counts of first-degree assault, reckless endangerment, unlawful use of a handgun, carrying a handgun, and discharging a firearm in Baltimore City.[3]

The clerk repeated each count in each case and the verdict announced on it. It is clear from the clerk's words that the "inaudible" response by the foreperson to the clerk's question had been that there was no verdict on the count of attempted second-degree murder in the Jackson case. Regarding the attempted murder counts, the clerk repeated the counts and verdicts as follows:

[A]s to the first count [of] attempted murder in the first-degree of Darian Nelson you said not guilty. As to attempted murder in the second-degree of Darian Nelson you said no answer .... as to attempt to kill and murder Davon Jackson there was no answer to either the first or second degrees....

The jurors agreed to the verdicts as recited by the clerk.

Defense counsel requested a poll, which was taken. Each juror agreed to the verdicts as announced by the foreperson

---

**3.** The verdict sheet, which lists the counts in the Nelson case followed by the counts in the Jackson case, had been filled in and signed by the foreperson, and was read by her.

and repeated by the clerk. The clerk then hearkened the jury to their verdicts, as the court had recorded them.[4]

After some unproductive discussion about the possibly of entering a *nol prosequi* on the three counts on which no verdicts were returned, the court declared a mistrial on those counts, saying:

> For the reasons we've discussed at length on the record, I'm going to find that with respect to all the other issues there's manifest necessity to declare a mistrial for the reasons that I discussed on the unresolved issues.

The jury then was discharged.

The appellant filed a motion for new trial, asserting that the jurors should have been allowed to continue deliberating until they reached an agreement on all counts. The State filed an opposition.

At a hearing on the motion, defense counsel argued that the jurors had been "forced into making a rushed judgment." He asserted that there was a sense of urgency on the part of the jurors to deliver a verdict "before we all get swept away by this storm," and that there was confusion in the jury box before the verdicts were taken, from which it appeared that the verdicts were not the product of "a whole lot of consensus and confidence." He maintained that, if the jurors had been kept to deliberate until they had decided all the counts in both cases, they might have changed their minds to the appellant's benefit on the counts on which guilty verdicts were returned. Defense counsel argued that the appellant's "right to a jury trial really was taken—in essence was taken away from him."

The judge denied the new trial motion. He pointed out that the jurors had reached agreement on some of the counts before they were brought into the courtroom and told the courthouse was closing. Also, in the judge's observation, there was not a sense of urgency in the courtroom and the verdicts were not rushed or coerced. Furthermore, the ver-

---

4. The verdict sheet as signed by the foreperson is consistent with the verdicts as polled and hearkened.

dicts were made clear by polling. Any confusion that preceded the poll appeared to him to have been about the correct numbers of the counts that were decided, not about the decisions themselves.

The judge gave the following assessment of the situation that existed when the partial verdicts were taken:

I didn't perceive there to be any question in [the jurors'] minds, but that they had a unanimous verdict on that which they had a[ ] unanimous verdict on. I did sense, as I recall, that there was some confusion as to whether or not [the foreperson] was identifying the right counts and identifying what she was entering a verdict on because that could have been a little confusing.... While there may have been a little confusion over which counts they were, that was more a matter of—not a matter of whether they agreed upon the counts, but as to what their numbers were. The—I didn't perceive their verdict was coerced.

### (b)

A criminal defendant in a Maryland court is guaranteed an "impartial jury" by the Sixth Amendment, as applied to the States through the Fourteenth Amendment, *Attorney Grievance Com'n of Maryland v. Gansler*, 377 Md. 656, 675, 835 A.2d 548 (2003), and by Article 21 of the Maryland Declaration of Rights. Article 21 further guarantees an accused in a criminal prosecution the right to a jury "without whose unanimous consent he ought not be found guilty." [5]

---

5. In federal criminal cases, the requirement of unanimity applies by reason of federal rule and by reason of the Sixth Amendment. *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). However, the Supreme Court has held that the Sixth Amendment's unanimity requirement does not apply to state criminal prosecutions. *Apodaca v. Oregon*, 406 U.S. 404, 410–12, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (holding that a state law providing that a criminal defendant could be convicted by a non-unanimous verdict, as long as ten jurors agreed, did not violate the Sixth Amendment). *See also Johnson v. Louisiana*, 406 U.S. 356, 360, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (holding that a conviction by a 9–3 verdict in certain noncapital cases did not offend Due Process Clause requirement for failure to satisfy

 In Maryland, for a verdict in a criminal case tried by jury to be final, the jury must intentionally render a unanimous verdict. *Smith v. State*, 299 Md. 158, 163–64, 472 A.2d 988 (1984); *Pugh v. State*, 271 Md. 701, 706, 319 A.2d 542 (1974). A case is removed from the province of the jury when the jury is hearkened to its verdict and the verdict is accepted by the court; or when the jury is polled, and the verdict as polled is accepted by the court. *Smith, supra*, 299 Md. at 168–69, 472 A.2d 988. Moreover,

> Until the case is removed from the jury's province the verdict may be altered or withdrawn by the jurors, or by the dissent or non-concurrence of any one of them. While the case is still within the province of the jury, the court may permit [the jurors] to reconsider and correct the verdict, provided nothing be done amounting to coercion or tending to influence conviction or acquittal.

*Id.*

Rule 4–327 governs the procedure for jury verdicts in criminal cases. Subsection (a) implements Article 21, stating that the verdict of a jury in such a case "shall be unanimous."

 Subsection (d) of Rule 4–327 allows for a partial verdict, *i.e.*, a verdict on less than all counts in a multi-count case. Generally, each count in an indictment is regarded as if it were a separate indictment, and the jury is required to determine whether to make a finding of guilt on each count without regard to the disposition of other counts. *Mack v. State*, 300 Md. 583, 595, 479 A.2d 1344 (1984); *Poole v. State*, 295 Md. 167, 174–75, 453 A.2d 1218 (1983). Under subsection (d) of Rule 4–327, in a criminal trial on two or more counts, the jury "may return a verdict with respect to a count as to which it has agreed, and any count as to which the jury cannot agree may be tried again." *See also State v. Woodson*, 338 Md. 322, 325–27, 658 A.2d 272 (1995) (a jury that is in

---

reasonable doubt standard). *But see Burch v. Louisiana*, 441 U.S. 130, 139, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979) (holding that conviction by non-unanimous six-person jury, at 5–1, for nonpetty offense under Louisiana law, violated the right to trial by a jury).

agreement on fewer than all counts in a multi-count indictment may return a partial verdict on the count or counts it has agreed upon, and return to deliberate further on the count or counts it has not agreed upon); *Harris v. State,* 160 Md.App. 78, 104, 862 A.2d 516 (2004) (same).

█ Subsection (e) of Rule 4–327 provides that, on request of a party or on the court's initiative, after the jury has returned a verdict and before it has been discharged, the jury shall be polled. This subsection further implements the state constitutional right of an accused to a unanimous verdict, under Article 21, by providing a means to establish that the verdict is with the jurors' unanimous consent. *Smith, supra,* 299 Md. at 163–64, 472 A.2d 988. For a verdict "to be considered final in a criminal case it must be announced orally to permit the defendant the opportunity to exercise the right to poll the jury to ensure the verdict's unanimity." *Jones v. State,* 384 Md. 669, 685, 866 A.2d 151 (2005).

█ A juror is free to repudiate a verdict upon a poll of the jury. *Maloney v. State,* 17 Md.App. 609, 626, 304 A.2d 260, *cert. denied,* 269 Md. 762 (1973). *See also Jones, supra,* 384 Md. at 683, 866 A.2d 151 (explaining that a verdict is final only if the jurors unanimously concur in the verdict when polled); *Smith, supra,* 299 Md. at 169, 472 A.2d 988 ("Any member of the jury has the right *sua sponte* to dissent from the verdict as announced by the foreman at any time before it is recorded and affirmed by the jury.") (internal quotation marks omitted). When, upon a poll, "the jurors do not unanimously concur in the verdict, the court may direct the jury to retire for further deliberations or may discharge them if satisfied that a unanimous verdict cannot be reached." Rule 4–327(e).

█ A verdict that is defective is not cured by hearkening or polling. *Smith, supra,* 299 Md. at 169, 472 A.2d 988. When a verdict is "ambiguous, inconsistent, unresponsive, or otherwise defective," the trial judge should call the jury's attention to the defect and direct the jurors to put it in proper form, if the defect is one of form; or return them to the jury

room for further deliberations, if the defect is one of substance. *Id.* at 170, 472 A.2d 988; *Heinze v. State,* 184 Md. 613, 617, 42 A.2d 128 (1945).

### (c)

The appellant complains that, in the unusual circumstances of this case, the trial judge accepted partial verdicts on tentative votes that were not yet final. This error violated his right to a unanimous jury. Furthermore, "forcing" the verdicts denied the appellant his right to an impartial jury.

The appellant supports his tentativeness argument by pointing to a number of factors that, in his view, show the jurors had not reached a final agreement on any count when the partial verdicts were taken. First, the deliberation did not end of its own accord, but was interrupted, suddenly. Second, according to the foreperson, before the deliberation was interrupted, the jurors were bargaining over their decisions on some counts. Third, the foreperson herself was so uncertain about whether agreements had been reached that she changed her report to the court about the number of counts on which verdicts were agreed, from all but one to all but more than one. Fourth, immediately before the verdicts were announced, there was confusion in the jury box, signaling that other members of the jury likewise were uncertain about what they had decided. Finally, that uncertainty continued during the announcement of the verdicts. One verdict first was returned as guilty and then was changed to "no verdict." When all was said and done, there were three counts—not one or two—on which no verdict was returned.

In support of his coercion argument, the appellant posits that the exigency of the situation—the imminent closure of the courthouse and the inability of the full jury to return to conclude its deliberation—compelled the jurors to reach and return verdicts that had not been agreed to. He asserts that, to the extent the jurors were discussing and deciding the case in the jury box, their deliberation took place under coercive

circumstances and their votes were not freely and voluntarily made.

In anticipation of the State's response, the appellant also argues that, because the partial verdicts were defective as not being the product of final agreements by the jurors, polling and hearkening did not cure their defects.

The State responds that the jurors knew during deliberation that each verdict on each count had to be unanimous, because they were so instructed before deliberation began. When the jurors were returned to the courtroom and told that the courthouse was going to be closed, the foreperson volunteered at the bench that they already had reached unanimous agreement as to most of the counts. The court double checked that the verdicts so reached were unanimous, asking, more than once, whether they were "12 to 0." The trial judge's assessment of the situation was that the jurors were in actual agreement on verdicts on the ten counts of guilty.

The State maintains that the foreperson's remark, "[w]e want to change one if they change that one," was vague and did not show, affirmatively, that the jurors still were deliberating on any of the counts on which verdicts then were returned. According to the State, the murkiness in the record—especially that it does not show that the foreperson was pointing to particular charges when saying "this one" and "that one" and that it does not reveal whatever was taking place in the jury box that the appellant now contends was "confusion"—militates against the appellant's tentative agreement and coercion arguments, because he bears the burden to present an adequate record on appeal. Also, the trial judge's observations of what transpired, made later at the hearing on the motion for new trial, belie the appellant's assertion that there was confusion in the jury box.

The State argues, in addition, that any confusion that may have occurred in the jury box and that may have been evidenced by the foreperson's changing statements about how many counts were agreed to are of no moment because the jurors were polled and hearkened to their verdicts.

The determinative issue here is whether, when the jurors ceased their deliberation, upon being interrupted and called into the courtroom, they had reached a final agreement on the counts on which the court then accepted verdicts.

 A jury only may return a verdict with respect to a count on which it has agreed. Rule 4–327(d). Accordingly, unless the jury has agreed on a verdict on a count, the court may not accept a partial verdict on that count. It is legal error to do otherwise. An agreement sufficient to produce a valid verdict must be unanimous because unanimity of decision is a fundamental aspect of the jury trial. *Davis v. Slater*, 383 Md. 599, 613, 861 A.2d 78 (2004). In a jury trial, " '[u]nanimity is indispensable to the sufficiency of the verdict.' " *Smith, supra*, 299 Md. at 164, 472 A.2d 988 (quoting *Ford v. State*, 12 Md. 514, 519 (1859)) (emphasis omitted). As we have explained, Article 21 of the Declaration of Rights guarantees that a criminal defendant "ought not be found guilty without the unanimous consent of the jurors." The concept of unanimity thus embraces not only numerical completeness but also completeness of assent, *i.e.*, each juror making his or her decision freely and voluntarily, without being swayed or tainted by outside influences. *See Bishop v. State*, 341 Md. 288, 294, 670 A.2d 452 (1996) (noting that, while the case is within the province of the jury, the court may permit the jury to reconsider verdicts upon which it is not unanimous but may do nothing to coerce or influence the verdicts); *Harris, supra*, 160 Md.App. at 101, 862 A.2d 516 (same).

 A jury verdict that is not unanimous is defective and will not stand. The Court of Appeals has held that, when, upon polling, a verdict is revealed not to be unanimous, there is no verdict. *Smith, supra*, 299 Md. at 179–80, 472 A.2d 988. In that situation, the trial court must take corrective action, either by returning the jury to its room for further deliberations or by noncoercively attempting to clarify a juror's ambiguous response through questions. *Heinze, supra*, 184 Md. at 617, 42 A.2d 128; *Glickman v. State*, 190 Md. 516, 525, 60 A.2d 216 (1948); *Harris, supra*, 160 Md.App. at 101, 862 A.2d 516.

▮ A verdict is defective for lack of unanimity when it is unclear whether all of the jurors have agreed to it. *See Lattisaw v. State,* 329 Md. 339, 346–47, 619 A.2d 548 (1993) (holding that trial court erred by enrolling guilty verdict and not taking steps to cure ambiguity after, in response to poll asking whether jurors agreed with verdict as announced by foreperson, juror gave ambiguous response, "Yes, with reluctance"). *See also Bishop, supra,* 341 Md. at 294, 670 A.2d 452 (holding that trial court erred in re-polling the jury when one juror said his verdict was given reluctantly; and further holding that not taking action sufficient to clarify the juror's ambiguous response and instead immediately re-polling the jury "generated a significant possibility" that the reluctant juror's "yes" vote was coerced, by communicating to him that any other vote was not acceptable); *Rice v. State,* 124 Md. App. 218, 222, 720 A.2d 1287 (1998) (holding that trial court properly acted to cure ambiguity in verdict as originally returned in noncoercive manner).

▮ Likewise, a verdict does not satisfy the unanimity of assent requirement, and hence is not a valid verdict, when the decision of a juror or the jury as a whole is conditional. *See Biggs v. State,* 56 Md.App. 638, 652, 468 A.2d 669 (1983) (recognizing the principle but holding that juror's response on polling was not conditional or uncertain). *See also Matthews v. United States,* 252 A.2d 505, 506 (D.C.1969) (contrasted and distinguished in *Biggs* ) (reversing judgment of conviction entered after one juror, on polling, said her vote was guilty but "conditional" and holding that, upon hearing that response, trial judge was required to return the jury to its room for further deliberation). *See also United States v. Austin,* 231 F.3d 1278, 1282 (10th Cir.2000) (holding that, "[w]hen there is doubt cast on the unqualified nature of the verdict, . . . th[e] court must take a closer look at the circumstances of the jury's recommendation"); *Cook v. United States,* 379 F.2d 966, 970 (5th Cir.1967) (holding that jurors' exceptional request, on poll of verdict, for extreme leniency was a circumstance strongly suggesting that verdict was conditioned upon court's acceptance of jury's mercy recommendation, and had

the effect of nullifying the verdict); *Lewis v. United States,* 466 A.2d 1234, 1238 (D.C.App.1983) (holding that test for validity of verdict is whether it is certain, unqualified, and unambiguous in light of, among other things, the circumstances surrounding its receipt).

Although it has never been addressed directly by the Maryland appellate courts, federal courts and other state courts addressing the unanimity aspect of a jury verdict have held that votes that are tentative, like those that are conditional, are not given with unanimous consent, because they are not final. In other words, a verdict that is reached by unanimous assent must be intended to be a final decision, not subject to change or further reconsideration in the deliberation process.

In *United States v. Taylor,* 507 F.2d 166 (5th Cir.1975), the court held that preliminary votes by a jury in the jury room do not constitute a verdict. The circumstances there were unusual. The jury was in the deliberating phase of the trial, in which 16 counts had been submitted for decision. After deliberation began but before a verdict was returned in open court, one juror suffered a fatal heart attack.[6] The remaining jurors were assembled in the courtroom and, in response to questions by the court, including whether they had reached a verdict on any count, stated that, before the death, all 12 of the jurors had voted and agreed to verdicts on three counts. The court had the jurors return to the jury room to take another vote on the same counts, which produced unanimous (11 to 0) votes. The court then accepted the verdicts of guilty on three counts and declared a mistrial on the other counts.

The Fifth Circuit reversed, concluding that the guilty verdicts were not valid, in part because they were returned on votes taken in the jury room, which are "preliminary." 507 F.2d at 168. The court held that "a jury has not reached a valid verdict *until deliberations are over,* the result is announced in open court, and no dissent by a juror is regis-

---

**6.** He was transported to a hospital where he was pronounced dead on arrival. 507 F.2d at 167.

tered." 507 F.2d at 168 (emphasis added). It explained that, especially when more than one count has been submitted for decision, "continuing deliberations may shake views expressed on counts previously considered. Jurors are not bound by votes in the jury room and remain free to register dissent even after the verdict has been announced, though before the verdict is recorded." *Id.* The court observed that upholding a verdict after one juror has died "deprives a criminal defendant of the very real benefit of reconsideration and change of mind or heart." *Id.* The court concluded that the "end result" in the case was "judgment by eleven," when the defendant had not agreed to a jury of less than twelve. *Id.*[7]

In *Com. v. Williams*, 279 Pa.Super. 28, 420 A.2d 727 (1980), a jury, while deliberating, wrote on its verdict sheet that it had reached a verdict of acquittal on an attempted murder count, one of six counts before it. In subsequent deliberations, it scratched out that entry. It later returned to the courtroom and informed the judge that it had reached a decision on a resisting arrest count but was hopelessly deadlocked on the remaining five counts. The court accepted the partial verdict on that count. Upon seeing the verdict sheet, the judge asked why the decision on the attempted murder count was scratched out. The foreman responded that the jurors had reconsidered their prior decision to acquit and were now deadlocked on that count. A motion for mistrial was granted.

---

7. At the time, the federal rules permitted a jury of less than 12 in a criminal case only upon the consent of the defendant. Subsequently, after the Supreme Court in *Williams v. Florida*, 399 U.S. 78, 86, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) held that there is no federal constitutional right to a 12–member jury, the federal rules were amended so that, even without the defendant's consent, "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." *See* Fed. R.Crim. Pro. 23(b).

The Maryland Declaration of Rights guarantees the common law right to a jury of 12 members. That right was abrogated in civil cases by constitutional amendment, which permits a jury of 6. Md. Const. art. 5 (1992). The right exists in criminal cases, however. It may be waived by the defendant. *Jones, supra*, 384 Md. at 683 n. 15, 866 A.2d 151; *State v. McKay*, 280 Md. 558, 566, 375 A.2d 228 (1977).

On appeal from a conviction in a retrial, the defendant argued that, under double jeopardy principles, he could not be retried for attempted murder. The court held that the acquittal decision made in the jury room, and entered on the verdict sheet, and then erased, had been a tentative decision that was not a final verdict on that charge; therefore, retrial was not barred under double jeopardy principles. *Cf. State v. Giblin,* 589 S.W.2d 431, 433 (Tex.Crim.App.1979) (holding that note from jury stating it had voted 12 to 0 for acquittal on one count and was hung on a second count was a report on the jury's progress in deliberating, not a final verdict).

In *United States v. DiLapi,* 651 F.2d 140 (2nd Cir.1981), two co-defendants challenged their convictions of obstruction of justice and conspiracy, arguing, in part, that the trial judge abused his discretion in failing to take partial verdicts after the jurors indicated, in a series of notes to the court during deliberation, that they had decided some counts against some defendants. Holding that the trial judge had not abused his discretion, in part because the jurors had not sought to return a partial verdict, the court observed that "[t]he difficulties of a jury's task in reaching unanimous verdicts as to several defendants tried on multiple charges counsel against judicial attempts to structure the course of jury deliberations." 651 F.2d at 146. The court warned that, in such cases, jurors who are "prohibited from returning a partial verdict as to some defendants ... might mistakenly infer that the individual consideration they had already given to some of the defendants is expected to be reassessed in light of their subsequent deliberations." *Id.* If the jurors are required to return a partial verdict, however, "there is a risk that some jurors might mistakenly permit a tentative vote to become an irrevocable final vote and forgo the opportunity to gain new insights concerning the evidence in one defendant's case from consideration of the same evidence as it bears upon other defendants." *Id.* at 147.

Subsequent federal courts of appeal cases have seen a synthesis of the observations in *Taylor* and *DiLapi.* In *United States v. Benedict,* 95 F.3d 17 (8th Cir.1996), a single

defendant case, the court held that the jury should not have been instructed to announce partial verdicts on three counts before it ended its deliberation on a remaining closely related conspiracy count. The jury had been deliberating for seven hours when it sent a note saying it had reached verdicts on three counts but was undecided on the last count. Over the defendant's objection, the court decided to take partial verdicts on the three decided counts and return the jury to deliberate further on the remaining count.

On appeal, the Eighth Circuit held it was error and an abuse of discretion for the district court to take partial verdicts when the jury "had reached tentative agreement on three of the four counts[,] all implications were that the jury was making progress towards unanimity on the undecided charge[,]" the jury was not deadlocked, neither party requested a partial verdict, the jury was not informed that announcing a partial decision would render those decisions final, and the remaining conspiracy count was closely related to the other three substantive offenses. 95 F.3d at 19–20. Citing *DiLapi* and quoting *Taylor, supra,* 507 F.2d at 168, the court observed:

> The danger inherent in taking a partial verdict is the premature conversion of a tentative jury vote into an irrevocable one.... It is improper for a trial court to intrude on the jury's deliberative process in such a way as to cut short its opportunity to fully consider the evidence. Such an intrusion would deprive the defendant of "the very real benefit of reconsideration and change of mind or heart."

95 F.3d at 19 (internal citations omitted).

*See also United States v. Nelson,* 692 F.2d 83, 85 (9th Cir.1982); *United States v. Wheeler,* 802 F.2d 778, 781 (5th Cir.1986) (holding that trial court did not err or abuse its discretion in taking partial verdict on decided counts and declaring mistrial in remaining counts, in multi-defendant, multi-count case, when a jury note implied that jurors were in agreement on most counts and were deadlocked on the others; court recognized that, in deciding whether to take partial

verdict trial judge must neither pressure the jury to reconsider what it has actually decided nor force the jury to turn a tentative decision into a final one). *Cf. United States v. Medansky*, 486 F.2d 807, 812–13 (7th Cir.1973) (holding that the trial court did not err in refusing to probe state of mind of jurors with respect to tentative verdicts, when no formal verdicts were returned, as court cannot order a tentative verdict made final).

*Commonwealth v. Floyd P.*, 415 Mass. 826, 615 N.E.2d 938 (1993), which also addresses the danger of converting a tentative decision into a final, irrevocable one by means of a partial verdict, when a final decision was not intended, is particularly instructive. In that case, a juvenile was charged in delinquency complaints with armed robbery, aggravated rape, and first-degree murder. The case was tried before a jury, which deliberated for six hours, adjourned for the night, resumed deliberation in the morning, and one-half hour later sent a note that said:

> "The jury has reached a guilty verdict on the first two charges, armed robbery and aggravated rape. However, two jurors will change their votes if the conviction on rape has to result in first-degree murder. The jurors are at an impasse on the murder charge. What is the next step?"

415 Mass. at 829, 615 N.E.2d 938. The jurors were assembled in the court room an hour later, and the note was read. At the direction of the judge, partial verdicts were returned on the armed robbery and aggravated rape charges. The judge then ordered the jurors to resume deliberation on the murder charge. The defense counsel objected to the acceptance of the aggravated rape verdict and to being deprived of the right to poll the jury on the partial verdicts. Forty-five minutes after resuming deliberations, the jurors returned a guilty verdict on the murder charge, which they affirmed by poll.

Reversing the verdicts, the court held that, while the trial court by rule had authority to accept partial verdicts that are unanimous,

[t]he authority to accept partial verdicts, however, does not encompass the power to accept a tentative or conditional verdict on any criminal charge. A jury verdict in a criminal case must be unanimous, and "[a] judge has no authority to direct a verdict when there are issues of fact to be resolved."

*Id.* at 831, 615 N.E.2d 938 (quoting *Commonwealth v. Hebert,* 379 Mass. 752, 755, 400 N.E.2d 851 (1980)). The court explained:

These principles recognize that, as a practical matter, jurors may agree in the course of deliberations to a tentative compromise on the facts of a case or on the disposition of related charges as they attempt to reach a unanimous agreement. Such tentative or conditional agreements, often forged in the course of intense discussion and negotiation, cannot have the force of a final verdict. "A jury should not be precluded from reconsidering a previous vote on any issue, and the weight of final adjudication should not be given to any jury action that is not returned in a final verdict."

*Id.* (quoting *A Juvenile v. Commonwealth,* 392 Mass. 52, 56, 465 N.E.2d 240 (1984), in turn quoting *People v. Hickey,* 103 Mich.App. 350, 353, 303 N.W.2d 19 (1981)).

The court held that the jury's note was not an unequivocal statement by the jurors that they had reached a unanimous verdict on the aggravated rape charge; rather, the note indicated that at least some of the jurors "were uncertain of the relationship between a possible adjudication on the aggravated rape complaint and final disposition of the murder charge, and, consequently, the jury had reached only a tentative disposition of the aggravated rape charge." *Id.* at 831–32, 615 N.E.2d 938. In any event, "[a]ny doubt on a question of this importance must be resolved in favor of protecting the defendant's right to a unanimous jury verdict." *Id.* at 832, 615 N.E.2d 938.

The cases we have discussed teach that, to satisfy the unanimous consent requirement, a verdict must be unam-

biguous and unconditional and must be final—in the sense of not being provisional or tentative and, to the contrary, being intended as the last resolution of the issue and not subject to change in further deliberation. A verdict that is tentative, not being by unanimous consent, is defective and not valid. In deciding whether to accept a partial verdict, a trial judge must guard against the danger of transforming a provisional decision into a final verdict. Just as when the total circumstances disclose an ambiguity or qualification in a verdict, when they suggest that the jury has made a tentative decision, the court must not accept the verdict. It should inquire into the jury's intention *vel non* that the verdict be final, if such inquiry can be done non-coercively; return the jury for further deliberation; or, if that is not possible and there is manifest necessity, declare a mistrial. Doubt must be resolved in favor of the defendant's constitutional right to a verdict by unanimous consent.

■ Whether a verdict satisfies the unanimous consent requirement is a question that implicates the defendant's state constitutional right, as provided in Article 21 of the Declaration of Rights. Accordingly, the issue is a mixed question of law and fact, which we review *de novo*, considering the totality of the circumstances. *See Bishop, supra,* 341 Md. at 292, 670 A.2d 452 (question of ambiguity in verdict determined *de novo* by Court of Appeals); *Lattisaw, supra,* 329 Md. at 347, 619 A.2d 548 (question whether verdict was coerced is a mixed question of law and fact subject to *de novo* review).

■ We conclude that, in the case at bar, the circumstances surrounding the partial verdicts indicated that they were tentative votes the jurors did not intend to be final, irrevocable verdicts.

The emergency closure of the courthouse, compounded by one juror's inability to return for deliberations the following Monday, disrupted and derailed the deliberations midstream, bringing them to an abrupt conclusion. We have found no Maryland case in which a verdict, partial or otherwise, was returned by a jury that was suddenly interrupted when it still

was in the process of deliberating. Indeed, *Taylor, supra,* 507 F.2d 166, is the only case in the country we have found in which a verdict was taken based on the *last* vote the jury took before their deliberations abruptly ended in an emergency.

In the Maryland cases in which partial verdicts properly were returned, the jurors had reported, outside of an exigent circumstance interrupting them and barring further deliberation, that they had made final decisions on some counts, and were not decided or were deadlocked on others. *See Woodson, supra,* 338 Md. at 325–27, 658 A.2d 272 (jury's note said they agreed on counts one and three but were deadlocked on count two; court took a partial verdict on count one; after further deliberation, the jury again reported a deadlock on count two; in holding that the defendant could not be reprosecuted on count three, the Court of Appeals commented that the court could have taken a partial verdict on that count, as it had on count one); *Harris, supra,* 160 Md.App. at 87–89, 862 A.2d 516 (jury reported it had decided the second-degree murder and use of a handgun counts but was deadlocked on the first-degree murder count; court took partial verdicts on the second-degree murder and use of a handgun counts and polled jurors; jurors resumed deliberations and later returned guilty verdict on the first-degree murder count); *Mayne v. State,* 45 Md.App. 483, 485–86, 414 A.2d 1 (1980) (jury's note said that jurors had reached a verdict on counts one and seven but were deadlocked on count two; court took verdict on counts one and seven). The circumstances in which the partial verdicts were returned showed that the jurors, while deliberating on their own timetable, carved out and finally decided certain counts. Those decisions were properly accepted by the trial courts as partial verdicts.

In this case, by contrast, it cannot be said that the jurors reached final decisions on certain counts while operating on their own deliberative timetable. The jurors were interrupted and brought out from deliberating due to an emergency that required them to leave the courthouse; and upon being told to return three days later to resume their deliberations, one of their members made it known that it would not be possible for

her to do so. Thus, the deliberation did not end on its own accord as to any count. Moreover, no one on the jury volunteered that a final decision had been made on any count. The status of the jury's decision making only came out when the court asked the foreperson for a progress report.

The foreperson's initial progress report, much like the jury note in *Floyd P., supra,* 415 Mass. 826, 615 N.E.2d 938, showed that, at the point that their deliberation was interrupted, the jurors were engaged in a give-and-take bargaining process in which all but one count had received a 12 to 0 vote, the remaining count had not, and some jurors had expressed a willingness to reconsider the votes they previously had cast. The bargaining process the foreperson described disclosed that the votes cast were intended to be provisional, in that the jurors regarded them to be subject to change as the deliberation continued.

The later reports by the jury foreperson revealed uncertainty about the number of counts that had received a 12 to 0 vote during deliberation. After first reporting that there was a 12 to 0 vote on all but one count, the foreperson reported that the votes had been 12 to 0 in all but two counts. Defense counsel complained during the interlude between reports that there was commotion in the jury box and that the jurors actually were discussing the case in the jury box—essentially, that they were continuing to deliberate while the court and the lawyers were dealing with the emergency circumstances that had arisen and discussing how to handle them.

During the poll, the uncertainty and confusion about the finality of the verdicts escalated. The foreperson at first announced a guilty verdict on attempted second-degree murder in the Jackson case, and then, apparently prompted by the reactions of other jurors, changed the announcement on that count to no verdict. The total number of counts announced as "no verdict" was three—not one, or two, as first reported and then amended by the foreperson at the bench—and the "no verdict" counts were in both the Jackson *and* the Nelson cases, not just in the Jackson case, as originally reported.

The totality of the circumstances leading up to and surrounding the taking of the partial verdicts in this case raised considerable doubt as to whether, before being called into the courtroom, the jurors had reached final verdicts, by unanimous consent, on the counts on which the partial verdicts then were taken. The jurors had not finished deliberating; they were engaged in a bargaining process in making their decisions that contemplated reconsideration; and the foreperson did not give consistent or clear information in response to questions from the court about the progress of decisions in the jury room. The decisions that at first were communicated by the foreperson to the judge were not the same decisions as later reported, as given during the announcement of the verdict, or as polled. They evolved after the jury was in the courtroom, further showing their provisional nature. The evolution coincided with, and lent support to, defense counsel's complaint that deliberation was continuing in the jury box.

While it is possible that the jurors only were discussing the numbers of the counts they had agreed on, the changing reports about their decision points away from that conclusion. In any event, we agree with the court in *Floyd P., supra,* 415 Mass. at 832, 615 N.E.2d 938, that doubt on this point must be resolved in favor of the appellant's constitutional right to a verdict by unanimous consent, and therefore in favor of a conclusion that the jury had not reached other than provisional agreements that could not be made final by taking partial verdicts.

The State is correct that the jurors were instructed that their verdict on each count was to be separately decided, by a unanimous vote. As we have explained, however, unanimity embraces the concept of finality, in the sense of not being tentative or provisional or subject to reconsideration. Jurors may cast votes in the jury room that are 12 to 0; however, because such votes are not meant to be irrevocable, they are not unanimous verdicts. With respect to the State's polling argument, as we already have explained, a verdict that is defective is not cured by polling or hearkening. The partial verdicts taken in this case were defective, because they were

not final decisions and therefore did not meet the requirement of unanimous consent.

Finally, while we conclude that it was error for the trial court to accept the partial verdicts, we do not agree that the trial court took any action to coerce the verdicts. To the contrary, deliberation conducted after the announcement of an emergency closure of the courthouse would have been a deliberation in a coercive environment.

## II.

### *Did the trial court err by declaring a mistrial on three counts?*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects persons against twice being put in jeopardy for the same offense. Jeopardy attaches in a jury trial when the jury is sworn. *See Illinois v. Somerville,* 410 U.S. 458, 467, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Woodson, supra,* 338 Md. at 329, 658 A.2d 272. In the mistrial/retrial variety of double jeopardy protection, when a mistrial is granted at the request of the State, or is granted by the court *sua sponte,* as happened here, retrial is barred unless there was "manifest necessity" for the mistrial. *Arizona v. Washington,* 434 U.S. 497, 506, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *State v. Crutchfield,* 318 Md. 200, 207, 567 A.2d 449 (1989) (citing *Cornish v. State,* 272 Md. 312, 322 A.2d 880 (1974)); *see also Malik v. State,* 152 Md.App. 305, 328, 831 A.2d 1101 (2003). This variety of double jeopardy protection preserves the defendant's "valued right to have his trial completed by a particular tribunal." *In re Mark R.,* 294 Md. 244, 249, 449 A.2d 393 (1982). *See also Wade v. Hunter,* 336 U.S. 684, 688, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *State v. Gorwell,* 339 Md. 203, 217, 661 A.2d 718 (1995).

The appellant maintains that the trial court deprived him of his fundamental right to a jury trial by not keeping the jurors in the courthouse to deliberate until they reached a final verdict on all counts. This contention functionally is a challenge to the trial court's *sua sponte* decision to grant a

mistrial on the three counts on which it granted a mistrial. The court did not keep the jurors in the courthouse to deliberate on those counts because it granted a mistrial on those counts.

■■■ As to those three counts, however, there are no final judgments. The jurors did not return verdicts on those counts. We do not know at this juncture whether the State will re-prosecute the appellant on those counts. If and when it does so, the double jeopardy issue—whether the judge properly declared a mistrial on those three counts based on manifest necessity—can be raised by motion to dismiss.[8] The issue is not properly before us for decision at this juncture, however.

### III.

### *Must the docket entries be amended to reflect a not guilty verdict on the attempted first-degree murder charge in the Nelson case?*

The docket entry and the transcript are in conflict as to the verdict on the charge of attempted first-degree murder of Nelson. The transcript reflects that the jury returned, and the clerk recorded, a not guilty verdict on this charge. The docket entry reflects a guilty verdict.

The appellant argues that, under *Carey v. Chessie Computer Services, Inc.*, 369 Md. 741, 748 n. 3, 802 A.2d 1060 (2002), when there is a discrepancy between the transcript and a docket entry, the transcript controls and the docket entry must be corrected accordingly.

The State concedes that the docket entry must be corrected to reflect that the appellant was acquitted of the charge of attempted first-degree murder of Nelson.

---

8. If a motion to dismiss based on double jeopardy were to be decided adversely to the appellant, the ruling would be subject to an immediate appeal under the collateral order doctrine. *Abney v. United States*, 431 U.S. 651, 662, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *Parrott v. State*, 301 Md. 411, 424–25, 483 A.2d 68 (1984).

■ When there is a conflict between the docket entries and the transcript, the transcript, "unless shown to be in error, takes precedence over the docket entries." *Shade v. State,* 18 Md.App. 407, 411, 306 A.2d 560 (1973); *see Jackson v. State,* 68 Md.App. 679, 687–88, 515 A.2d 768 (1986). Additionally, if necessary, "the docket will be corrected." *Carey, supra,* 369 Md. at 748 n. 3, 802 A.2d 1060 (citing *Waller v. Md. Nat'l Bank,* 332 Md. 375, 379, 631 A.2d 447 (1993)).

■ The transcript in fact reflects that a not guilty verdict was announced on the charge of attempted first-degree murder of Nelson:

> THE CLERK: [D]o you find that the Defendant, Corey Caldwell did attempt to kill and murder Darian Nelson in the first-degree, not guilty or guilty?
>
> JUROR: Not guilty.

The handwritten and printed docket sheets nevertheless both reflect that a guilty verdict was announced on the charge of attempted first-degree murder of Nelson. Plainly, these entries were clerical errors. The verdict on that count as announced by the foreperson, polled, and hearkened, was not guilty. Accordingly, we direct the clerk to amend the docket entries to reflect the not guilty verdict that the jury announced on the charge of attempted first-degree murder of Nelson.

**JUDGMENTS OF CONVICTION IN NELSON AND JACKSON CASES REVERSED; CASES REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS AND, IN NELSON CASE, WITH DIRECTIONS TO AMEND THE DOCKET ENTRIES TO REFLECT A NOT GUILTY VERDICT ON ATTEMPTED FIRST–DEGREE MURDER COUNT. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

## ON MOTION FOR RECONSIDERATION

■ In a motion for reconsideration, the State asks that we reverse the judgment of acquittal of attempted first-degree

murder in the Nelson case, on the same ground that we are reversing the judgments of conviction in the Nelson and Jackson cases. The State reasons that, because we found all the partial verdicts defective, due to their being tentative and not final, we should reverse the judgments of conviction *and* the judgment of acquittal.

 Supreme Court double jeopardy jurisprudence draws a distinction between retrial after conviction and retrial after acquittal, however. "An acquittal is accorded special weight." *United States v. DiFrancesco,* 449 U.S. 117, 129, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). If legal error was committed at the trial, resulting in reversal of a conviction, double jeopardy does not bar retrial (in the absence of insufficient evidence). *North Carolina v. Pearce,* 395 U.S. 711, 720, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). By contrast, even if legal error was committed at the trial, a retrial will be prevented by an acquittal. *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896).

> "The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal," for the "public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though 'the acquittal was based upon an egregiously erroneous foundation.' " *See Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629. If the innocence of the accused has been confirmed by a final judgment, the Constitution conclusively presumes that a second trial would be unfair. *Arizona v. Washington,* 434 U.S. [497], at 503[, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) ]. . . .
>
> The law "attaches particular significance to an acquittal."

*DiFrancesco, supra,* at 129, 101 S.Ct. 426 (quoting *United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978)).

 Moreover, under Maryland common law,

> From the earliest days, it has been clear that once a verdict of not guilty has been rendered at the conclusion of a criminal trial, that verdict is final and cannot be set aside.

Any attempt to do so by the prosecutor is barred by what at common law was the plea of *autrefois acquit.*

*Pugh v. State,* 271 Md. 701, 705, 319 A.2d 542 (1974). A verdict of acquittal after trial never can be set aside upon application of the prosecutor, whether it was based on a mistake of law or a mistake of fact. *Id.* (citing *State v. Shields,* 49 Md. 301, 303 (1878)). *See also Farrell v. State,* 364 Md. 499, 506–07, 774 A.2d 387 (2001); *Stuckey v. State,* 141 Md.App. 143, 162–63, 784 A.2d 652 (2001).

In the case at bar, we have held that the circuit court committed legal error in taking the partial verdicts in this case, all of which were convictions, except the acquittal on attempted first-degree murder in the Nelson case. For the reasons explained above, the judgment of acquittal remains notwithstanding that it, too, was the product of legal error. Accordingly, the State's motion for reconsideration is denied.